FILED

MAURIELLO LAW FIRM, APC
Thomas D. Mauriello (SBN 144811)
1181 Puerta Del Sol, Suite 120
San Clemente, CA 92673
Telephone: (949) 542-3555
Facsimile: (949) 606-9690
Email: tomm@maurlaw.com

2012 OCT -3 PM 3: 44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

[Additional Counsel Listed on Signature Page]

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

IRENE CORSON and SUSAN M.
YACKS, On Behalf Of Themselves
And All Others Similarly Situated,

                  Plaintiffs,

    v.

TOYOTA MOTOR SALES,
U.S.A., INC. and TOYOTA
MOTOR CORPORATION,

                  Defendants.

CASE NO. CV12-8499 -DSF
( VBK )

[CLASS ACTION]

COMPLAINT

JURY TRIAL DEMANDED

BY FAX

## CLASS ACTION COMPLAINT

    Plaintiffs, Irene Corson ("Corson") and Susan M. Yacks ("Yacks") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and all other persons similarly situated, against Defendants, Toyota Motor Sales, U.S.A., Inc. ("TMS") and Toyota Motor Corporation ("TMC") (collectively, "Toyota" or "Defendants"), and, in support thereof, aver as follows upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are made upon knowledge:

## NATURE OF ACTION

    1.    Plaintiffs bring this action individually and on behalf of the proposed class ("Class") as more fully defined below, for the benefit and protection of all

CLASS ACTION COMPLAINT

1

current and former owners and lessees of model year 2009 and 2010 Toyota Corolla and Matrix[1] automobiles purchased or leased in the United States (the "Class Vehicles" or "Vehicle(s)").  Plaintiffs bring this class action on behalf of themselves and all other similarly situated persons to obtain damages, restitution, as well as injunctive and other relief.

2.     Beginning in at least 2008, Defendants designed, manufactured, distributed, sold, leased, serviced and warranted the Vehicles that are the subject of this action.  The Vehicles all contain a design defect and/or flaw with the Electric Power Steering ("EPS") system, which causes the Vehicles to wander or drift from center at highway speeds and/or suddenly veer to one direction during normal use ("Defect").

3.     Since 2008, Toyota has sold hundreds of thousands of Vehicles equipped with the defective EPS system.

4.     Toyota knew or should have known that the Class Vehicles are defective, not fit for their intended purpose and unsafe when they are driven within their normal and/or expected range of operation.  Nevertheless, Toyota has actively concealed and failed to disclose the Defect to Plaintiffs and the Class members, both prior to and after the time of purchase.

5.     Toyota knew that owners and lessees of the Vehicles would reasonably expect that the steering system of the Vehicles would operate in a predictable and expected manner during normal use and Plaintiffs and other consumers did, in fact, have precisely that expectation.

6.     Since at least July 2008, Toyota, through correspondence with the National Highway Traffic Safety Administration ("NHTSA"), its own internal research, receipt of consumer complaints, communications with its dealers and other sources, has known about the Defect, but has failed to disclose the existence of the Defect to consumers or to provide, disclose, or make available remedies

---

[1] The Toyota Matrix is sometimes referred to as the "Corolla Matrix."

which can reduce or eliminate this extremely unsafe and economically burdensome condition.

7.     On February 17, 2010, Toyota issued a statement which expressly recognized that it was aware of the numerous consumer complaints about the issue. *See http://pressroom.toyota.com/article_display.cfm?article_id=1884* ("We are aware of complaints regarding 2009 and 2010 Corolla steering systems and are actively investigating the issue.")

8.     Despite notice and knowledge of the Defect from the numerous consumer complaints it has received, as well as information received from dealers, NHTSA complaints, and its own internal records, Toyota has not recalled the Class Vehicles to repair the Defect or offered to reimburse its customers.   Instead, Plaintiffs and Class members have been required to unilaterally take the initiative to address the Defect and have incurred costs related to remedying this Defect on their own and have, thus, suffered loss of property and otherwise been damaged as a result of this Defect.

9.     Due to the Defect, consumers have been, and will continue to be, forced to deal with an extremely unsafe situation.   First, drivers of the defective Vehicles must constantly, and to an excessive degree, correct their direction of travel to maintain a safe, straight course and avoid veering from side to side on the roadway.   Second, this Defect causes drivers to lose control of the Vehicles during normal operation, posing significant risk of injury to persons and property.   The Defect is substantially certain to manifest during the useful life of the Vehicles and occurs in the course of normal use and operation of the Vehicles.

10.     Although Toyota has denied the existence of the Defect despite knowledge of hundreds of consumer complaints, it has acknowledged a problem with the EPS system and, on June 3, 2010, issued Technical Service Bulletin T-SB-0140-10 (the "TSB"), setting forth an entirely voluntary procedure, which may be requested by consumers, to repair the EPS system.   The voluntary procedure

CLASS ACTION COMPLAINT

3

must be paid for by the consumer unless the Vehicle's 36 month/36,000 mile warranty remains in effect.  Toyota has not issued a recall with respect to the Defect or the EPS system.

11.   Despite issuance of the TSB, Toyota has not made the repair procedure known to all affected customers or even to the dealers who would be responsible for performing the repairs.  When taking their Vehicles to Toyota dealers and expressing complaints of the Defect, consumers continue to be told that there is nothing wrong with their Vehicles and that there is nothing that can be done to remedy their complaints.

12.   Had Plaintiffs and other Class members known about the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid less for them.

13.   As a result of the Defect in the Class Vehicles and the monetary costs associated with the procedure set forth in the TSB or in otherwise attempting to remedy the Defect, Plaintiffs and Class members have suffered injury in fact, incurred damages and have otherwise been harmed by Toyota's conduct.

14.   This action is brought to remedy violations of state consumer protection statutes in connection with Toyota's misconduct, including its conscious effort to conceal material facts concerning the Defect during the distribution, marketing, sale, advertisement and consumer and warranty service performed with respect to the Vehicles.

15.   Plaintiffs and the Class assert claims under the Unfair Competition Law ("UCL" or "Section 17200"), Business and Professions Code §§ 17200, *et seq.,* the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.,* and California's "Secret Warranty" law, Civil Code §1795.92.

## PARTIES

16.   Corson is, and at all times relevant to this action has been, a citizen of New York.  In or about April 2009, Corson purchased a new 2009 Toyota Corolla

for her personal use from an authorized Toyota dealer, New Country Toyota, located in Saratoga Springs, New York.

17.     Yacks is, and all times relevant to this action has been, a citizen of Pennsylvania.  In or about July 2009, Yacks purchased a used 2009 Toyota Corolla for her personal use from an authorized Toyota dealer, Lancaster Toyota-Mazda-Scion, located in East Petersburg, Pennsylvania.

18.     TMC is a Japanese corporation and is the parent corporation of TMS. TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota, Lexus and Scion automobiles in California and multiple other locations worldwide, including throughout the United States.

19.     TMS is Toyota's U.S. sales and marketing arm, which oversees sales and other operations throughout the United States.  TMS distributes Toyota, Lexus and Scion vehicles and sells these vehicles through its network of dealers.  TMS is, and at all times relevant to this action has been, a California corporation that maintains its principal place of business within this judicial district in Torrance, California, and much of the conduct that forms the basis of this Complaint emanated from TMS' headquarters in Torrance, California.  TMC, thus, is a citizen of California.

20.     A copy of the requisite affidavits pursuant to Cal. Civ. Code § 1780(d) are attached as **Exhibit "A".**

21.     Money received from the purchase of a Toyota vehicle from a dealer flows from the dealer to TMS.  Money received by the dealer from a purchaser can be traced to TMS and TMC.

22.     TMS and TMC sell Toyota vehicles through a network of dealers who are the agents of TMS and TMC.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy, upon information and belief, exceeds

$5,000,000, exclusive of interest and costs, and this is a class action in which certain of the Class members and Defendants are citizens of different states.

24.     This Court has personal jurisdiction over Defendants because Defendants are authorized to do business, and currently do business, in this state.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because TMS is a resident of this judicial district, is headquartered in this judicial district, engages in substantial business throughout this district, and many of the acts complained of herein emanated from or took place within this district.

## FACTUAL ALLEGATIONS

26.     This is an action brought against Toyota on behalf of Plaintiffs and all current and former owners and lessees of the Vehicles.

27.     Defendants have designed, manufactured, distributed, marketed, warranted, sold and leased the Class Vehicles.  Upon information and belief, Defendants have sold, directly or indirectly through authorized dealers and other retail outlets, thousands of Class Vehicles in California and nationwide.

28.     According to Toyota, the Corolla is the best-selling compact car in the United States.  *See http://www.toyota.com/corolla.*  The Toyota Matrix is the compact hatchback counterpart of the Corolla.  *See http://www.toyota.com/matrix.*

29.     Toyota has touted the safety of the Class Vehicles, and in a December 22, 2012 press release stated that it has an "ongoing commitment to developing safe and reliable vehicles for our customers."
*http://pressroom.toyota.com/article_display.cfm?article_id=2826.*

30.     In a September 24, 2009 press release touting the safety of 2010 Corollas, Toyota represented to consumers the following:

> An electric power-assist steering system uses a compact motor, speed reducer and torque sensor built into the steering column. The system varies the amount of assistance according to engine rpm and vehicle speed. The result is appropriate weight and responsiveness at higher speeds, and light effort at low speeds.

> Electric power steering reduces parasitic losses to the engine, thereby aiding fuel economy. It is also environmentally efficient, because it does not require hydraulic oil.

*http://pressroom.toyota.com/article_display.cfm?article_id=1747.*

31. Also in its September 24, 2009 press release, Toyota stated as follows:

> As part of the Toyota Star Safety System, VSC automatically adjusts engine output and the vehicles braking force at individual wheels to help control any discrepancy between where the driver is steering and where the vehicle is heading.

32. Toyota has consistently marketed the Vehicles as "safe" and proclaimed that safety is one of its "highest corporate priorities."

33. In the Warranty and Maintenance manuals included with all Class Vehicles, Toyota states:

> At Toyota, our top priority is always our customers. We know your Toyota is an important part of your life and something you depend on every day. That's why we're dedicated to building products of the highest quality and reliability.

> Our excellent warranty coverage is evidence that we stand behind the quality of our vehicles. We're confident—as you should be—that your Toyota will provide you with many years of enjoyable driving.

34. Also in the Class Vehicles' Warranty and Maintenance manuals, Toyota acknowledges that consumers rely on its statements regarding quality and reliability in deciding to purchase a Toyota, stating, "[w]e realize that your confidence in the quality and reliability of our products was a key factor in your decision to buy a Toyota."

35. The warranty language, which appears in substantially similar form in the warranty for all the Vehicles, is false and misleading because, in fact, the Class Vehicles are not of the highest quality and reliability but instead are unsafe and unreliable due to the Defect.

36. Toyota has received thousands of complaints from consumers about the Defect.

37.     Despite notice of the Defect in the Class Vehicles, Toyota did not disclose to consumers that its Vehicles—which Toyota for years has advertised as "safe" and "reliable"—were (and are), in fact, not safe and reliable as a reasonable consumer would expect, due to the safety risk of wandering or drifting steering and sudden unexpected loss of control over steering.  Rather than disclose the truth, Toyota has concealed the existence of this Defect, which renders the Vehicles unsafe.

## Defective EPS System

38.     No reasonable consumer expects the steering of a vehicle to wander or drift, or to become unpredictable or uncontrollable.  The proper functioning of such a critical component as steering is reasonably expected by every purchaser of a vehicle, including the Vehicles at issue in this litigation.  The EPS system at issue did not, and does not, meet the reasonable expectations of Plaintiffs and other Class members.  The Defect is, therefore, material to consumers, as the manner in which it was designed and installed in the Vehicles did not satisfy the reasonable expectations of consumers.

39.     On information and belief, the EPS system installed in the Vehicles is supplied by a company called JTEKT Corporation ("JTEKT"), which is the main steering system supplier to Toyota.  JTEKT claims that use of an EPS system on new vehicles in lieu of a hydraulic pump system improves fuel economy, reduces carbon dioxide emissions, and can be assembled more quickly.

40.     Toyota first switched from hydraulic to electric power steering with the 2009 Corolla and Matrix models.

41.     In a January 25, 2008 press release regarding the EPS, Toyota described the new EPS steering mechanism as follows:

> Steering is accomplished via a newly designed rack and pinion assembly that is lighter and more rigid.
>
> In a significant departure from past engineering practice with the Corolla, the input to that steering rack is supplied by electric power

CLASS ACTION COMPLAINT

steering. Using a compact motor, speed reducer and torque sensor built into the steering column, the amount of assistance the system delivers varies according to engine rpm and vehicle speed. The result is appropriate weight and responsiveness at higher speeds, and light effort at low speeds.

Use of electronic power steering helps enhance fuel economy because it uses electrical power only when assist force is necessary. It is environmentally efficient because it does not require oil like conventional hydraulic power steering systems do.

In the unlikely event that an abnormality should occur within the electronic power steering system, a fail-safe function will shut down the output current. The system then becomes fully manual, and it remains fully operable. A warning lamp in the dash illuminates to notify the driver of the abnormality.

42.    Since the introduction of the Class Vehicles which incorporate the EPS system, both Toyota and the NHTSA have received over 160 complaints about the steering of the Vehicles.  Consumers commonly complain that the steering is comparable to being buffeted by strong winds, sliding on black ice, or hydroplaning.  Consumers observe that their attempts to straighten the car result in overcorrection, requiring the driver to use a tight, persistent, two-handed grip on the wheel to travel in a straight line.

43.    In February 2010, the NHTSA opened a formal investigation into the steering issue, stating as follows:

The Office of Defects Investigations (ODI) has received 168 owner complaints which allege experiences with the steering becoming unresponsive or loose while driving at highway speeds in model year (MY) 2009 through 2010 Toyota Corolla and Matrix vehicles equipped with electric power steering.  Of these, 8 allege that the condition caused or contributed to a crash, including 7 MY 2009 vehicles and 1 MY 2010.

44.    Toyota has admitted that the steering problems identified by consumers are a result of Toyota's design concept for the Vehicles.  On August 9, 2010, Chris Santucci, Manager of Technical and Regulatory Affairs for TMC, sent a letter to the NHTSA, taking issue with the NHTSA's determination that certain steering incidents with Class Vehicles resulted in crashes.  In the letter, Mr. Santucci states, "Toyota continues to believe that the design and performance of

the steering system on the subject vehicles is appropriate.  Dynamic performance is not unusual when compared to other competitive models, and it is consistent with the model's steering design concept."

45.    At the time it closed its Preliminary Report on May 4, 2011, the NHTSA had identified 918 unique complaints and 4,118 Toyota warranty claims related to steering wander, drift or pulling.  Several of the identified incidents had resulted in Vehicle crashes, with or without an accompanying personal injury.

46.    Recognizing that the Defect was widespread, Toyota issued the TSB on June 3, 2010, entitled "Steering On-Center Feel."  The TSB provides a repair procedure for the Defect which includes replacement of the Power Steering Computer Assembly.  Although the TSB provides that the repair is covered under the Toyota Comprehensive Warranty, this is little solace to the consumers who have experienced the safety Defect after the expiration of the warranty and who were otherwise not provided the redesigned mechanism and were not informed of the TSB.

47.    Despite issuance of the TSB, consumers have reported to the NHTSA significant problems getting Toyota to address the Defect with respect to their Vehicles.  Representative examples of such complaints include the following:

> a) I THEN DROVE THE CAR (FOR THE FIRST TIME ON A HIGHWAY) AND NOTICED THAT THE CAR WAS INDEED UNSTEADY IN CURVES. IT WONDERED LEFT AND RIGHT AND THE POWER STEERING SEEMED LOOSE OR WAS ADDING POWER STEERING BOOST WHEN NOT NECESSARY.... I NOW NOTICED THAT THE VEHICLE, WHEN IN LEFT CURVES, CONTINUED TO HAVE THIS SLACK OR LOOSE FEELING AT HIGHWAY SPEEDS AND WOULD NOT CORRECT ITSELF OR STRAIGHTEN OUT COMING OUT OF THE CURVES. ONE WOULD HAVE TO KEEP YOUR HANDS ON THE STEERING WHEEL TO COMPENSATE FOR THE LOOSENESS .... THEY SAID THE ALIGNMENT WAS PERFECT (I HAVE BOTH PRINT OUTS TO CONFIRM) .... I CONTACTED A TOYOTA SERVICE MANAGER, THEY ARE AWARE OF THE ISSUE BUT HAVE NO FIX FOR THE PROBLEM AS OF THIS DATE. (10/19/10)

b) I HAVE READ IN CONSUMER REPORTS THAT TOYOTA HAS ADDRESSED THIS AND IS OFFERING A FIX, ONLY TO THOSE CUSTOMERS WHO COMPLAIN, TO REPLACE THE EPS CONTROL MODULE. I CONTACTED MY DEALER ON 9/24/2010 AND THE SERVICE MANAGER STATED HE KNEW NOTHING ABOUT THIS FIX. THE DEALERS WERE SUPPOSED TO KNOW ABOUT THIS IN JUNE 2010 FROM A SERVICE BULLETIN FROM TOYOTA CORPORATE. PLEASE REQUIRE TOYOTA TO ISSUE A RECALL TO REPLACE THE EPS CONTROL MODULE AS THE DEALERS ARE RELUCTANT TO FIX UPON REQUEST FROM THE CUSTOMER.

c) ON JUNE 3, TOYOTA ISSUED A BULLETIN TO DEALERS TELLING THEM TO ADDRESS COMPLAINTS BY CHECKING THE TIRE PRESSURE AND ALIGNMENT. IF THOSE STEPS ARE INSUFFICIENT, THE BULLETIN TOLD DEALERS THEY COULD REPLACE THE COMPUTER THAT GOVERNS THE ELECTRIC POWER STEERING WITH A NEW UNIT, WHICH TOYOTA SAID HAD BEEN "RE-TUNED" WITH AN "ALTERNATIVE STEERING FEEL." AS OF AUG 18, 2010, MY LOCAL DEALER SAYS HE KNOWS OF NO PROBLEM WITH COROLLA STEERING AND CAN NOT FIND A SERVICE BULLETIN ABOUT 2009-2010 COROLLA STEERING.

d) MY 2009 TOYOTA COROLLA XLE (ORIGINAL OWNER) CONTINUES TO HAVE DIFFICULTY STAYING CENTERED IN ITS LANE. I HAVE REPORTED THIS TO TOYOTA CORPORATE MANY TIMES. I HAVE BEEN TO THE TOYOTA DEALERSHIP MANY TIMES REGARDING THIS CAR. TOYOTA CORPORATE TOLD ME THEY SENT A REPRESENTATIVE TO CHECK THE CAR. I WAS NOT ALLOWED TO MEET THE REPRESENTATIVE NOR OBSERVE THE CHECKING OF THE CAR. I RECEIVED A LETTER FROM TOYOTA CORPORATE THAT THIS CAR "MEETS TOYOTA'S SPECIFICATIONS". THIS MAKES TWICE THAT A "REPRESENTATIVE FROM CORPORATE" HAS CHECKED MY CAR. MY CAR STILL DOES NOT STAY CENTERED IN ITS LANE.

e) ELECTRONIC POWER STEERING (EPS) - CAR SWAYS AND CANNOT STAY IN STRAIGHT LINE - NOTICEABLE ON A DAILY BASIS - DEALERSHIP TRIED TO CORRECT- STILL DRIFTING – COMPLAINED – DEALERSHIP CHANGED WHEELS/TIRES - SWAYING STILL EXISTS- DEALERSHIP SAID I JUST NEEDED TO "GET USE TO THE NEW EPS"

f) FROM WHEN NEW THE CAR WANDERS AND DRIFTS WHEN AT HIGHWAY SPEEDS. HAVE TRIED TO GET DEALERS TO FIX WITH NO SUCCESS.

g) PROBLEM WITH ELECTRONIC STEERING SYSTEM ON 2009 TOYOTA COROLLA WHEN DRIVING WITH HIGH SPEED (60-80 MPH). THE CAR ROCKS FROM LEFT AND RIGHT AND IS HARD TO KEEP IT GOING STRAIGHT. TOOK THE CAR TO TOYOTA DEALERSHIP AND WAS TOLD THAT THEY COULDN'T FIND ANYTHING WRONG WITH IT.

h) THE DEALERSHIP HAS BEEN IN CONTACT WITH TOYOTA CORPORATE WHO ARE SAYING THAT THERE IS NO PROBLEM AND THAT THE CASE HAS BEEN CLOSED WITH NHTSA. WHAT AM TO DO WHEN THE DEALERSHIP ADMITS TO NOT KNOWING HOW TO FIX THE PROBLEM AND THE REGIONAL SERVICE REP FOR TOYOTA SAYS THERE IS NO PROBLEM AND THAT THE CASE WITH THE STEERING COLUMN IS CLOSED.

i) MY 2009 TOYOTA COROLLA CONTINUES TO HAVE STEERING ISSUES ... OVERSTEERING, NOT STAYING CENTERED IN ITS LANE. I HAVE BEEN TO THE DEALERSHIP PROBABLY 12 OR MORE TIMES WITH THIS VEHICLE.

### Experiences of Plaintiffs and the Class

48.     Soon after purchasing her Vehicle, and within the Vehicle's warranty period, Corson began to experience the effects of the Defect at issue in this case. The Vehicle constantly veered from side to side at highway speeds.  Corson, on at least three occasions in late 2009 and 2010 complained of the Vehicle problems and Defect to the Toyota dealer's service personnel. On each occasion, she was told that there was no problem or Defect with the Vehicle.

49.      At all pertinent times, Corson has maintained the Vehicle as recommended by Toyota.   Although Corson has maintained her Vehicle as recommended by Toyota, the Defect at issue here manifests irrespective of individual user driving and maintenance habits.

50.     Soon after purchasing her Vehicle, and within the Vehicle's warranty period, Yacks began to experience the effects of the Defect at issue in this case.  In fact, shortly after purchasing the Vehicle, Yacks' young daughter was driving the Vehicle on a highway when the Vehicle suddenly veered off the right.  To no avail, Yacks' daughter tried very hard to steer the Vehicle to the left, but it continued

CLASS ACTION COMPLAINT

onto the shoulder of grass and gravel. The Vehicle's steering then suddenly seemed to engage, but when it did so, the steering overcompensated due to Yacks' daughter's attempts to keep the Vehicle off the shoulder of the road. The Vehicle then spun out of control, across oncoming traffic where it came to rest in an embankment on the opposite side of the highway. Incredibly, no persons were injured. After the incident, Yacks complained of the Vehicle problems and Defect to the Toyota dealer's service personnel. The Toyota dealer's service personnel retained the Vehicle for approximately one month. However, she was told that there was no problem or Defect with the Vehicle.

51. At all pertinent times, Yacks has maintained her Vehicle as recommended by Toyota. Although Yacks has maintained her Vehicle as recommended by Toyota, the Defect at issue here manifests irrespective of individual user driving and maintenance habits.

52. Plaintiffs' experiences mirror those of thousands of other owners and lessees of the Vehicles. The Internet is replete with references to the common and profound problems that consumers have experienced with the Vehicles as a result of the safety Defect. The problem with the Vehicles is both significant and widespread. Consumers have made the following representative complaints about the Vehicles to the NHTSA:

- Shawnee, Kansas, July 7, 2009:
  I HAVE A 2010 COROLLA 4 DR LE MODEL, WHICH I BOUGHT IN JULY 2009. I CONTINUE TO NOTICE THAT THE CAR "WANDERS" ON THE ROAD WHILE DRIVING; GENERALLY IT IS REALLY NOTICEABLE ABOUT 50 MPH. WHEN THERE ARE WINDY CONDITIONS (FREQUENT IN KANSAS), I HAVE TO CONSTANTLY CORRECT MY DIRECTION OF TRAVEL SINCE THE WIND EXACERBATES THE WANDERING OF THE VEHICLE. I THOUGHT THAT IT WAS DUE TO THE CROWN OF THE PARTICULAR ROAD, BUT IT DOES IT ON ALL ROADS. MY WIFE HAS DRIVEN THE CAR AND NOTICED THE SAME THING. I HAVE NOT LOST CONTROL OF THE VEHICLE, BUT IT CONCERNS ME THAT A CAR WOULD NOT DRIVE IN A REASONABLE STRAIGHT LINE. THIS IS THE VERY FIRST CAR I'VE EVER OWNED THAT DID IT; IT IS NOT THE FIRST TOYOTA I'VE

EVER OWNED, AND HAVE NEVER EVER HAD SUCH A PROBLEM. I CANNOT GIVE A SPECIFIC DATE OF INCIDENT, AS IT DOES IT ALL THE TIME, SO I WILL INDICATE THE DELIVERY DATE OF THE VEHICLE TO ME.

- Chicago City, Minnesota, March 1, 2010
I HAVE A 2010 TOYOTA COROLLA. I PURCHASED IT IN JULY AND REALIZED FAIRLY SOON THAT THERE SEEMS TO BE A PROBLEM WITH THE STEERING. AT FIRST I THOUGHT IT WAS JUST ME BECAUSE I HAVE DRIVEN LARGE SUV'S FOR THE PAST 20 YEARS AND I THOUGHT IT WAS JUST BECAUSE IT WAS A SMALL CAR. MY GROWN SON USED MY CAR TO GO ON A ROAD TRIP AND WHEN HE GOT HOME, HE TOLD ME I HAD A SERIOUS PROBLEM WITH THE STEERING. HE SAID HE COULD HARDLY KEEP IT ON THE ROAD. IF YOU TAKE YOUR HANDS OFF THE STEERING WHEEL FOR EVEN A SECOND, THE CAR VEERS TOWARDS THE DITCH. IT SEEMS TO MOSTLY HAPPEN AT HIGHER SPEEDS. I TOOK IT TO THE DEALER AND THEY SAID THERE IS NOTHING WRONG WITH THE CAR. I DECIDED TO DRIVE IT FOR AWHILE AS I FELT COMFORTABLE BECAUSE IT HAS A FULL WARRANTY. ABOUT TWO WEEKS AGO, I WAS DRIVING IN THE LEFT LANE ON THE INTERSTATE AND MY CAR ABRUPTLY VEERED INTO THE RIGHT LANE AND I ALMOST SIDE SWIPED THE CAR IN THE RIGHT LANE. IT WAS AS IF A HUGE BLAST OF WIND HIT ME FROM THE LEFT AND SHOVED ME INTO THE RIGHT LANE. IT SCARED ME AND I WAS SO CLOSE TO BEING IN A MAJOR ACCIDENT. I BROUGHT THE CAR BACK TO TOYOTA AGAIN THIS WEEK AND THEY TELL ME AGAIN....NOTHING WRONG. THE CAR IS SQUIRRELLY AND ALL OVER THE ROAD. I REALLY FEEL THERE IS A SERIOUS PROBLEM WITH THE STEERING IN THIS CAR AND I DO NOT KNOW WHERE TO GO FROM HERE.

- Bonita Springs, Florida, March 24, 2010:
THE CONTACT OWNS A 2010 TOYOTA COROLLA LE. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED UNDER NHTSA CAMPAIGN ID NUMBER 10V023000 (VEHICLE SPEED CONTROL: ACCELERATOR PEDAL). THE VERY NEXT DAY, THE VEHICLE DROVE OVER A CURB WITHOUT DRIVER INTENT. ON A SEPARATE OCCASION, WHILE DRIVING AT AN APPROXIMATE SPEED OF 45 MPH, THE STEERING WHEEL UNCONTROLLABLY BEGAN VEERING FROM LEFT TO RIGHT WITHOUT DRIVER ASSISTANCE. THE VEHICLE WAS TAKEN TO THE DEALER FOR DIAGNOSTIC TESTING. THE DEALER COULD NOT DUPLICATE THE FAILURE. THE DEALER STATED THAT THERE WERE NO REPAIRS AVAILABLE TO CORRECT THE FAILURE. THE OWNER STATED THAT HE WOULD NOT DRIVE THE VEHICLE OVER 1700 MILES. THE APPROXIMATE CURRENT AND FAILURE MILEAGES WERE 3,437.

- Blue Eye, Missouri, March 6, 2010:
  ON MARCH 6, 2010 I PURCHASED A NEW 2010 TOYOTA COROLLA. I DROVE HOME APPROX. 50 HIGHWAY MILES AND IMMEDIATELY NOTICED THAT THE STEERING SEEMED VERY DIFFERENT. THE SLIGHTEST MOVEMENT OF THE STEERING WHEEL RESULTED IN THE CAR WANDERING RIGHT TO LEFT. I WAS AWARE THAT THE CAR HAD EPS BUT IN NO WAY AWARE THAT THERE HAD BEEN PROBLEMS REPORTED SIMILAR TO THE ONE THAT I WAS EXPERIENCING. PERHAPS RATHER THAN A SLIGHT MOVEMENT OF THE STEERING WHEEL, SOME ISSUE CAUSED THE NEED TO CONTINUOUSLY STEER THE VEHICLE. IN ANY EVENT I THOUGHT THAT THE EPS WAS JUST SOMETHING THAT ONE HAD TO GET ACCUSTOMED TO. HOWEVER, NOW THAT I AM AWARE THAT I AM NOT ALONE IN HAVING THIS EXPERIENCE, I FELT THAT I SHOULD COMPLETE THIS REPORT. DRIVING LONG DISTANCES ON THE HIGHWAY IS NOT A PLEASURE IN THIS VEHICLE. THAT IS ABOUT IT, THANKS FOR YOUR TIME.

- Apalachin, New York, August 1, 2010:
  I DRIVE A 2010 TOYOTA COROLLA. AS I PROCEEDED DOWN MY STREET AT ABOUT 25MPH, I SUDDENLY HEARD A BEEPING NOISE AND NOTICED THE POWER STEERING WARNING LIGHT ON MY DASH. A FEW SECONDS LATER, I LOST CONTROL OF MY STEERING. THE CAR SLID TO THE RIGHT, INTO A DITCH. I TRIED TO STEER LEFT TO BRING THE CAR OUT OF THE DITCH, BUT NOTHING HAPPENED. I TURNED THE STEERING WHEEL AS FAR AS I COULD TO THE LEFT, AND IT SLOWLY PULLED THE CAR OUT OF THE DITCH. ALL OF THIS HAPPENED IN A MATTER OF SECONDS.

- Broken Arrow, Oklahoma, September 2, 2010:
  THE CONTACT OWNS A 2010 TOYOTA COROLLA. WHILE TRAVELING 65 MPH THE CONTACT NOTICED THAT THE VEHICLES ALARM HAD SUDDENLY ACTIVATED, SECONDS LATER THE VEHICLE STEERING WHEEL BEGAN TO TURN TO THE RIGHT CAUSING THE CONTACT TO CRASH INTO A DITCH. NO ONE WAS INJURED AND A POLICE REPORT WAS NOT FILED. THERE WERE NO PRIOR WARNINGS AND THE VEHICLE WAS NOT DIAGNOSED. THE CURRENT AND FAILURE MILEAGES WERE 9243.

- Middle Grove, New York, December 2, 2009:
  THE CONTACT OWNS A 2009 TOYOTA COROLLA. THE CONTACT WAS DRIVING APPROXIMATELY 55 MPH ON NORMAL ROAD CONDITIONS. UNEXPECTEDLY, THERE WAS A LOSS OF STEERING CONTROL WITHOUT WARNING AND THE VEHICLE BEGAN TO WANDER INTO ANOTHER LANE. THE DRIVER WAS ABLE TO GAIN CONTROL AFTER A COUPLE OF SECONDS. THE FAILURE OCCURRED INTERMITTENTLY CAUSING THE VEHICLE TO PULL INTO ONE DIRECTION. THE VEHICLE WAS

TAKEN TO AN AUTHORIZED DEALER FOR DIAGNOSTIC TESTING. THE TECHNICIAN WAS UNABLE TO LOCATE THE FAILURE. THE CONTACT HAD CONCERNS OF THE POTENTIAL SAFETY HAZARD WHEN DRIVING AT LOW SPEEDS. THE FAILURE MILEAGE WAS 8,000. . . THE CONSUMER STATED THE VEHICLE WOULD STEER MOSTLY TO THE LEFT FOR A FEW SECONDS.

- Acton, Maine, January 22, 2009:
I LOST CONTROL OF THE STEERING IN MY 200 COROLLA AND IT RESULTED IN AN ACCIDENT. DEALER REFUSED TO ACKNOWLEDGE THE PROBLEM AND BLAMED IT ON MY POOR DRIVING.

- Buena Park, California, January 11, 2009:
ON JANUARY 11TH 2009 I GOT IN AN ACCIDENT IN MY 2009 TOYOTA COROLLA. I WAS TRAVELING AT APPROXIMATELY 65 MPH ON THE I-5 SOUTH IN SAN DIEGO. I NOTICED A CAR INCHING INTO MY LANE CLOSE TO HITTING ME SO I IMMEDIATELY TOOK EVASIVE ACTION AND TURNED MY STEERING WHEEL TO THE LEFT AND IMMEDIATELY LOST CONTROL. I SKIDDED TO THE LEFT THEN TO THE RIGHT TRYING TO COUNTER STEER THE WHOLE TIME TO NO EFFECT. I HIT THE CAR THAT I WAS TRYING TO AVOID AND THEN SPUN 180 DEGREES AND SLAMMED INTO THE CENTER DIVIDER. I FEEL THAT I LOST CONTROL WAY TO EASILY. I NOTICED NOT BEING ABLE TO KEEP THE WHEEL STEADY AS WELL PRIOR TO THE CRASH. I RECEIVED WHIPLASH AND WAS TREATED AT A MILITARY HOSPITAL.

- Omaha, Nebraska, December 27, 2008:
I WAS SOMEWHAT RELIEVED TO SEE THAT THERE, IN FACT, IS AN ISSUE WITH THE STEERING ON THE 2009 COROLLA. I BOUGHT MY FIRST TOYOTA IN SEPT. 2008, WHICH WAS A 2009 COROLLA. THAT WINTER, I WAS DRIVING ACROSS THE STATE DURING THE HOLIDAYS. I WAS ON THE INTERSTATE GOING 75 MPH, THE SPEED LIMIT. WITH NO EXPLANATION, ALL OF A SUDDEN I LOST CONTROL OF MY CAR. I HADN'T DONE ANYTHING TO LOSE CONTROL AND THERE WERE NO WEATHER ISSUES. I FOUND MYSELF SKIDDING ACROSS TWO TO THREE LANES OF INTERSTATE TRYING TO GET CONTROL BACK OF MY CAR. . . . I EASILY COULD HAVE FLIPPED MANY TIMES THROUGH A DITCH AND GOD KNOWS WHAT ELSE. THANKFULLY THERE WERE NO CARS ON EITHER SIDE OF ME WHEN THIS HAPPENED. TO THIS DAY IT HAS HAUNTED ME ON WHAT HAPPENED THAT DAY AS I HAVE NEVER BEEN THAT CLOSE TO WHAT I CONSIDER A "NEAR DEATH" EXPERIENCE. I EASILY COULD HAVE DIED THAT NIGHT AND I REALIZE THAT. I TOOK MY CAR IN THE NEXT DAY TO THE DEALER AND ASKED THEM TO LOOK AT IT. THEY DID AND SAID THEY COULDN'T FIND ANYTHING. PLEASE DO A RECALL ON THIS ISSUE.

- Poughquag, New York, February 16, 2010:
  THE CONTACT OWNS A 2009 TOYOTA COROLLA. WHILE
  THE CONTACT WAS DRIVING 50MPH THE VEHICLE
  SUDDENLY DRIFTED TO THE LEFT CAUSING THE
  VEHICLE TO SPIN 180 DEGREES AND CRASH INTO A
  GUARD RAIL. MOMENTS LATER A SECOND VEHICLE
  CRASHED INTO THE CONTACTS VEHICLE. THERE WERE
  NO INJURIES. A POLICE REPORT WAS FILED. THE
  VEHICLE HAD NOT BEEN DIAGNOSED WHEN THE
  COMPLAINT WAS FILED. THE FAILURE MILEAGE WAS
  32,400.

- Third Lake, Illinois, January 20, 2010:
  STEERING ISSUE WITH 2009 TOYOTA COROLLA, 25,050
  MILES. WHILE TRAVELING AT 20MPH IN RESIDENTIAL
  SUBDIVISION, VEHICLE VEERED LEFT, STEERING
  UNRESPONSIVE, SPUN 180 DEGREES AND CAME TO REST
  AGAINST THE CURB ON THE OPPOSITE SIDE OF THE
  ROAD. CAR IN FRONT AND CAR TO THE REAR PASSED
  THROUGH SAME AREA WITHOUT INCIDENT. ALSO,
  VEHICLE WILL DRIFT ABRUPTLY AT HIGHWAY SPEEDS,
  SIMILAR TO EFFECT OF HIGH CROSSWIND OR ICE, WITH
  NO MOVEMENT OF STEERING WHEEL AND NONE OF THE
  BODY ROLL THAT USUALLY ACCOMPANIES A
  CROSSWIND, REQUIRES HIGH LEVEL OF
  ATTENTIVENESS TO AVOID CROSSING LANE
  BOUNDARIES. THIS BEHAVIOR IS SPORADIC, BUT A 10-
  MILE TRIP IS ENOUGH DISTANCE FOR SEVERAL
  OCCURRENCES. GIVEN THE INTERMITTENT NATURE OF
  THIS ISSUE, I HAVE NOT REPORTED IT TO THE
  DEALERSHIP NOR TO TOYOTA, SO NOTHING HAS BEEN
  DONE AND NO REPAIRS HAVE BEEN ATTEMPTED.

- San Jose, California, July 31, 2008:
  I WAS DRIVING ON TO THE OFF RAMP AND OFF THE
  FREEWAY DECELERATING FROM ABOUT 65 MILES PER
  HOUR. I FELT AS IF A STRONG GUST OF WIND PUSHED
  MY CAR TO ONE SIDE AT THE SAME TIME THIS
  OCCURRED THE STEERING WHEEL JERKED TO THE LEFT
  PULLING MY HAND WITH IT. AT THIS POINT I HAD NO
  IDEA WHAT HAD HAPPENED I TRIED TO RECORRECT
  THE WHEEL AND INSTEAD IT WENT WILDLY BACK TO
  THE RIGHT. THIS HAPPENED ANOTHER TIME WITHIN A
  COUPLE OF SECONDS. THE NEXT THING I KNOW THE
  CAR SPUN AROUND 180 DEGREES FACING ONCOMING
  TRAFFIC OF CARS COMING OFF THE FREEWAY AT
  WHICH POINT THE CAR DRIFTED, HIT THE CURB AND
  ROLLED INTO THE EMBANKMENT. THE CAR WAS
  TOTALED. MY PASSENGERS LEG WAS ALSO INJURED
  AND WE ARE LUCKY TO BE ALIVE. . . .

- Columbia, Missouri, January 10, 2010:
  THE CONTACT OWNS A 2009 TOYOTA COROLLA. HE
  STATED THAT THE ELECTRONIC STEERING WHEEL
  BECAME DIFFICULT TO CONTROL AND RESISTANT
  WHEN TURNING THE WHEEL IN EITHER DIRECTION. HE

ALSO STATED THAT THE VEHICLE WOULD BEAR TO THE LEFT OR RIGHT OFTEN TIMES WITHOUT DRIVER INTENT. THE DEALER WAS CONTACTED AND THEY TEST DROVE THE VEHICLE WITH THE OWNER AT APPROXIMATELY 35 MPH AND VERIFIED THAT THE FAILURE DOES EXIST. . . .

- Elmhurst, Illinois, March 30, 2009:
  EVER SINCE I PURCHASED MY 2009 TOYOTA COROLLA I HAVE NOTICED STEERING DIFFICULT. I READ BLOGS AT THE TIME AND IT SEEMED FROM WHAT I READ, THAT THIS WAS JUST A DRAW BACK OF THE CAR, SO I LET IT GO. I FEEL I NEED TO REPORT IT NOW. THE STEERING FEELS WAY TO RESPONSIVE TO EVEN THE SLIGHTEST HAND MOVEMENT OF THE WHEEL, OR BUMP IN THE ROAD. BECAUSE THE SUSPENSION ON THIS MODEL IS SO STIFF, A BUMP IN THE ROAD CAN CAUSE MY HAND TO MOVE A TINY BIT, RESULTING IN THE CAR MOVING MUCH MORE THAN ONE WOULD EXPECT FROM LITTLE MOVEMENT. THE BEST WAY TO SUM UP THE PROBLEM IS THIS; IT IS NEAR IMPOSSIBLE TO JUST GO STRAIGHT, OR HOLD THE WHEEL STILL FOR A SECOND. YOU HAVE TO CONSTANTLY MOVE SLIGHTLY TO THE RIGHT OR THE LEFT JUST TO KEEP IN THE MIDDLE OF YOUR LANE. GOING AROUND CURVES SMOOTHLY IS DIFFICULT AS WELL. IF IT IS WINDY THIS PROBLEM IS 10 FOLD, AND DOWN RIGHT DANGEROUS. I HAVE ALREADY SKIDDED OFF A SNOWY HIGHWAY BECAUSE THE CAR SO EASILY FISH TAILED WHILE TRYING TO CORRECT MY STEERING. LUCKILY THERE WAS NO DAMAGE, HAD THERE BEEN VEHICLE IN THE LANE NEXT TO MINE, THERE WOULD HAVE BEEN A HORRIFIC CRASH. IN MY 17 YEARS OF DRIVING I HAVE NEVER FISH TAILED BEFORE. THE ALIGNMENT AND TIRES HAVE BEEN CHECKED AND ARE FINE. I HAD THE BRAKE RECALL DONE BEFORE THE ABOVE MENTIONED INCIDENT. THERE DOESN'T FEEL TO BE AN ALIGNMENT ISSUE. THE CAR DOES NOT PULL. THE STEERING JUST SEEMS FAR TOO SENSITIVE, THIS COMBINED WITH IT'S ODD AERODYNAMIC RESPONSE, AND BUMPY RIDE MAKE THE STEERING FEEL VERY UNSAFE AT TIMES. EVEN WHEN IT DOESN'T FEEL DANGEROUS, IT IS TIRING TO HAVE TO CONSTANTLY ADJUST THE WHEEL RIGHT AND LEFT JUST TO KEEP IT IN LANE. I'VE NEVER HAD A STEERING ISSUE LIKE THIS WITH ANY OTHER CAR. . . .

Fayetteville, North Carolina, August 4, 2009:
2009 TOYOTA COROLLA HAS A PROBLEM WITH THE STEERING THAT CAUSED THE CONSUMER TO HAVE AN ACCIDENT. *NJ THE CONSUMER STATED AFTER SHE MADE A RIGHT TURN, THE VEHICLE CONTINUED TO VEER ON ITS OWN TO THE RIGHT. THE CONSUMER TRIED TO STEER THE VEHICLE, BUT IT SEEMED AS THOUGH THE STEERING WHEEL WAS LOCKED. SHE ATTEMPTED TO APPLY THE BRAKES, BUT TO NO AVAIL. THE CONSUMER WAS TRAVELING APPROXIMATELY 15-

20 MPH WHEN THE VEHICLE WENT DOWN A CLIFF APPROXIMATELY 25-20 FEET DEEP, HITTING A TREE AND A FENCE BEFORE THE VEHICLE CAME TO A COMPLETE STOP. THE CONSUMER AND HER 2 PASSENGERS WERE INJURED. THE CONSUMER STATED THERE WAS A RECALL REGARDING THE BRAKE SYSTEM, HOWEVER SHE WAS TOLD NOTHING ABNORMAL WAS FOUND WITH THE VEHICLE.

53.     A February 2008 review of the 2009 Corolla by the publication Car & Driver characterized the Vehicle's steering problem as a "major flaw," stating "it just doesn't feel right.  On-center, the wheel seems to have some heft to it, but as you turn it slightly in either direction, the power assist kicks in much more than we thought necessary.   The effect is a major dead spot on-center, particularly noticeable above 60 mph, that requires constant correction to maintain your lane." http://www.caranddriver.com/reviews/2009-toyota-corolla-short-take-road-test-dynamically-average-with-one-major-flaw-page-2.

### Toyota's Knowledge of the Defect

54.     Despite the fact that Toyota issued the TSB on June 3, 2010, which introduces a replacement Power Steering Computer Assembly to correct the Defect in the Class Vehicles, Toyota did not provide notice of this TSB to its customers.

55.     Toyota's failure to disclose the Defect and the Class members' need to pay for costly repairs if not covered by a warranty are material facts about which consumers reasonably would have expected to have received notice.  Had Plaintiffs and Class members known about the safety Defect and the need to replace the Power Steering Computer Assembly to fix the Defect, they would not have bought or leased the Class Vehicles, or they would have paid less to purchase or lease them.

56.     Plaintiffs and Class members have reported the Defect to Toyota directly, through its dealers, and through complaints to NHTSA and on various Toyota-based forums and chat rooms on the Internet.  Toyota is fully aware of the Defect in the Class Vehicles.  Despite this, Toyota has actively concealed the existence and nature of the Defect from Plaintiffs and Class members at the time of

purchase or lease and thereafter.  Specifically, Toyota has engaged in the following acts and omissions:

    a.    failed to disclose, at and after the time of purchase or lease and attempts to repair, any and all known material facts or material Defects associated with the Class Vehicles, including the associated repair costs, as well as the Defect that exists in the Class Vehicles during their normal and/or expected range of operation;

    b.    failed to disclose, at the time of purchase or lease, that the Class Vehicles were not in good working order, were defective and unsafe and were not fit for their intended purposes; and

    c.    failed to disclose or actively concealed the fact that the Class Vehicles were and are defective, despite the fact that Toyota learned of such defects through its own internal records, testing, dealership repair orders and consumer complaints as early as February 2010 (if not earlier).

57.    When Plaintiffs and Class members have visited authorized Toyota dealers to complain about the Defect (pursuant to the warranty provisions), Defendants have concealed the true nature of the Defect by failing to acknowledge the Defect, failing to make free repairs, refusing to verify the Defect by performing proper testing, or attributing the Defect to other factors such as driver skill.

58.    Toyota has not recalled the Class Vehicles to repair the Defect and has not offered to its customers a suitable repair or replacement free of charge.

59.    Problems related to the Defect during foreseeable normal usage result in the inability of owners and/or lessees to use the Class Vehicles as they were intended and expected to be used.

60.    When driving within their normal and/or expected range of operation, the Class Vehicles are defective and pose an unreasonable safety risk for Class members.  A reasonable consumer expects and assumes when he/she buys a vehicle that the steering will not wander, drift, pull, or cause loss of vehicle control when the vehicle is being used within its normal and/or expected range of operation.  The existence of a safety defect is evidenced by numerous accidents resulting from the Defect.

61.    In addition to repair costs associated with remedying the Defect,

Toyota has a duty to disclose the defective nature of the Class Vehicles to consumers because, *inter alia*, (a) the Defect poses an unreasonable safety hazard; (b) Toyota has exclusive knowledge or access to all of the material information, and has known that these facts were not known or reasonably discoverable by the Plaintiffs or the Class members; and (3) Toyota has actively concealed the Defect present in the Class Vehicles from its consumers.

### California Contacts

62.     TMS is headquartered in Torrance, California.  According to a Toyota brochure regarding its United States Operations in 2009, TMS is "Toyota's U.S. sales and marketing arm," which "oversees sales and other operations in 49 states."

63.     Toyota does substantial business in California, with a significant portion of the proposed nationwide Class located in California.

64.     California hosts a significant portion of Toyota's U.S. operations. In California, Toyota maintains both Toyota and Lexus sales and service offices, financial service offices, manufacturing facilities, a research and development center, and a design center.  Also, Toyota Motor Engineering and Manufacturing North America, Inc. has major operations in Torrance, California.

65.     In addition, the conduct that forms the basis for each and every Class members' claims against Toyota emanated from the headquarters in Torrance, California.

66.     Toyota personnel responsible for customer communications are located at TMS's California headquarters, and the core decision not to disclose the Defect to consumers was made and implemented from there.

67.     Toyota personnel responsible for managing Toyota's customer service division are located at the TMS's California headquarters.

68.     These California personnel implemented Toyota's decision to deny the existence of the Defect when customers complained.

69.     Toyota personnel responsible for communicating with dealers

21

regarding known problems with defective Vehicles are also located at TMS's California headquarters, and the decision not to inform Toyota dealers of the Defect was made and implemented from there.

70.     Toyota's presence is more substantial in California than any other state.  It has four "Financial Service Offices" in California, a "Hiro" operation or manufacturing facility, a research and development center, and a design center in California.  It also has more employees in California than any other state.

71.     On information and belief, during the Class Period, hundreds of thousands of defective Vehicles manufactured in Japan have entered the United States at ports in California.

72.     Toyota has significant contacts with the State of California, such that nationwide application of California law is appropriate.  Further, Toyota's conduct at issue emanated from California such that application of California law nationwide is appropriate.  *See Clothesrigger, Inc., v. GTE Corp.*, 236 Cal.Rptr. 605 (1987); *Wershba v. Apple Computer, Inc.*, 110 Cal.Rptr. 2d 145 (2001).

73.     Toyota provided Plaintiffs and each owner and lessee with a three-year warranty, pursuant to which it was obligated to repair and/or replace defective parts at no charge (inclusive of labor).  During that warranty period and under the terms of Defendants' express warranty, Toyota was (and is) obligated to repair the Defect in the Vehicles under the terms of the express warranty, but has failed to do so.

74.     As a result of Toyota's conduct, Plaintiffs and members of the Class have suffered injury in fact and otherwise suffered damages and been harmed.

75.     As a result of the Defect, the Vehicles' value (including, without limitation, its value at the time of purchase as well as the re-sale value) has been substantially and permanently diminished, as Plaintiffs and members of the Class have not received the value for which they bargained when they purchased or leased the Class Vehicles.

76.     By this action, Plaintiffs seek relief pursuant to the UCL, CLRA, and Secret Warranty law.

77.     Plaintiffs seek injunctive relief, actual damages, disgorgement of profits, statutory damages, damages for Defendants' unjust enrichment, attorneys' fees, costs, and all other relief available to the Class as defined herein.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs request that this Court certify the following Class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All current and former consumer owners and lessees of a model year 2009 or 2010 Toyota Corolla or Matrix vehicle purchased or leased in the United States of America.

Excluded from the Class are officers and employees of Toyota and any of its dealers, any Class members asserting personal injury claims, and the Judge to whom this case is assigned and his or her immediate staff.

79.     In the event the Court determines that California law cannot be applied to consumers nationwide as proposed by the Class described above, Plaintiffs, in the alternative, seek to certify the following sub-classes:

> New York Sub-Class: All current and former consumer owners and lessees of a model year 2009 or 2010 Toyota Corolla or Matrix vehicle purchased or leased in New York.

> Pennsylvania Sub-Class: All current and former consumer owners and lessees of a model year 2009 or 2010 Toyota Corolla or Matrix vehicle purchased or leased in Pennsylvania.

80.     This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, typicality, adequacy, predominance and/or superiority requirements of that Rule.

81.     Numerosity.  Upon information and belief, the members of the Class number in at least the thousands.  As a result, the Class is so numerous that joinder of all members in a single action is impracticable.  The members of the Class

should be readily identifiable from information and records in Defendants' possession, custody or control. The disposition of these claims will provide substantial benefits to the Class.

82. <u>Commonality/Predominance</u>. There is a well-defined community of interest and common questions of law and fact which predominate over any questions affecting only individual members of the Class. These common legal and factual questions will generate common answers which are apt to drive the resolution of the litigation, do not vary from members of the Class, and which may be determined without reference to the individual circumstances of members of the Class, include, but are not limited to the following:

    a. Whether the Vehicles are defective;

    b. Whether Toyota's conduct violated the UCL;

    c. Whether Toyota's conduct violated the CLRA;

    d. Whether Toyota concealed the nature of the Defect in the Vehicles from Plaintiffs and the members of the Class; and

    e. Whether, as a result of Toyota's misconduct, Plaintiffs and the members of the Class are entitled to damages, restitution, equitable relief and/or other damages and relief, and, if so, the amount and nature of such relief.

83. <u>Typicality</u>. The representative Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all members of the Class were injured by the same wrongful practices in which Defendants have engaged and are based on the same legal theories. The only difference may be the amount of damages sustained by each member of the Class, which can be determined readily, and does not bar Class certification.

84. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately protect and pursue the interests of the members of the Class. Plaintiffs understand the nature of the claims herein, their role in these proceedings, and have and will vigorously represent the interests of the Class. Plaintiffs have retained Class

counsel who are experienced and qualified in prosecuting class actions and other forms of complex litigation.  Neither Plaintiffs nor their attorneys have interests which are contrary to or conflict with those of the Class.

85.  <u>Superiority/Manageability</u>.  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of members of the Class is economically infeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member resulting from Defendants' wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual members of the Class prosecuting separate claims is remote and, even if every person could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individual members of the Class do not have significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

86.  Certification of the case as a class action under the laws of California is appropriate because:

a.  TMC and TMS conduct substantial business in and from California;

b.  TMS's principal and executive offices, as well as its corporate headquarters, are located in California;

c.  Decisions regarding Toyota's failure to disclose the Defect and attendant safety risks were made in California;

d.  Defendants' marketing, promotional activities and literature, as well as TMS's warranties, are coordinated at, emanate from, and/or are developed at its California headquarters;

25

e.   The UCL and other claims asserted in this Complaint on behalf of the Class may be appropriately brought on behalf of California and out-of-state Class members; and

f.   A significant number of members of the Class reside in the State of California.

87.   The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers and/or on the internet.

## FIRST CAUSE OF ACTION
### (Violations of Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.*)

88.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

89.   Plaintiffs bring this cause of action on behalf of a nationwide Class. Defendants have engaged in unfair, unlawful, and fraudulent business practices as set forth above.

90.   By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of the UCL.

91.   Plaintiffs and the Class reasonably expected that their Vehicles would not be defectively designed such that the steering would wander, drift, pull, or cause the Vehicle to become uncontrollable during normal use.

92.   Defendants knew that the Class Vehicles were defectively designed or manufactured, posed a safety risk and were not suitable for their intended and/or expected use.

93.   In failing to disclose the Defect present in the Class Vehicles, as well as the associated (potential) repair options and attendant costs, Defendants have knowingly and intentionally concealed material facts.

94.   Defendants' unfair or deceptive acts or practices occurred repeatedly

in Defendants' trade or business, and were capable of deceiving a substantial portion of the purchasing public.

95. The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances.

96. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

97. Defendants' acts and practices are unlawful because they violate Civil Code §§ 1572, 1688, 1709-1710, 1770(a)(5), 1770(a)(7), 1770(a)(9), 1770(a)(19), and California Commercial Code § 2313. Defendants' acts and practices are also unlawful because they violate Business and Professional Code §§ 17500, *et seq*. Specifically, Defendants marketed and sold the Vehicles in a defective condition and deceptively and intentionally failed to disclose the Defect when they were under a duty to do so. Toyota's marketing, sales and representations, as well as its concomitant omissions, were material.

98. Defendants have been unjustly enriched and should be required to make restitution, ordered to disgorge improper funds, provide injunctive relief to Plaintiffs and the Class and all other relief allowed under Section 17200, *et seq.*, plus interest, attorneys' fees and costs pursuant to, *inter alia*, Cal. Code of Civ. Proc. § 1021.5.

### SECOND CAUSE OF ACTION
### (Consumers Legal Remedies Act, Violation of Civil Code §§ 1750, *et seq.*)

99. Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

100. Plaintiffs bring this cause of action on behalf of a nationwide Class. Alternatively, in the event that the Court determines that California law cannot be applied to consumers nationwide, Plaintiffs alternatively bring this cause of action

on behalf of a California-only class of Vehicles.

101.   This claim arises under the CLRA.

102.   At all times relevant hereto, Plaintiffs were "consumers" as that term is defined in Civ. Code § 1761(d).

103.   At all times relevant hereto, Toyota's Vehicles constituted "goods" as that term is defined in Civ. Code §1761(a).

104.   At all times relevant hereto, Defendants constituted "persons" as that term is defined in Civ. Code § 1761(c).

105.   At all times relevant hereto, Plaintiffs' purchases of the Vehicle constituted a "transaction" as that term is defined in Civ. Code §1761(e).

106.   At all times relevant hereto, Defendants provided "services" to Plaintiffs and the Class within the meaning of Civil Code § 1761(b).

107.   The CLRA provides in relevant part that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: (5) Representing that goods . . . have . . . approval, characteristics, uses, benefits . . . which they do not have; ... (7) Representing that goods . . . are of a particular standard, quality or grade . . . if they are of another ...; (9) Advertising goods . . . with intent not to sell them as advertised; and (19) Inserting an unconscionable provision in the contract."  Civil Code §§ 1770 (a)(5), (7), (9) and (19).

108.   Toyota, despite its knowledge of the Defect, failed to disclose and concealed the Defect from consumers, including Plaintiffs and members of the Class.  The omission was and is material, as Plaintiffs and members of the Class would not have purchased or leased the Vehicles had they known of the Defect, or would have paid substantially less for them.

109.   The undisclosed Defect poses a threat to the safety of Plaintiffs and Class members, as well as the safety of others on roadways throughout the United

States.

110.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

111.   Defendants knew that the Class Vehicles were defectively designed or manufactured and not suitable for their intended use.

112.   Defendants were under a duty to Plaintiffs and the Class to disclose the defective nature of the Class Vehicles and the associated repair costs because:

a.   Defendants had exclusive knowledge of, or were in a superior position to know, the true state of facts about the Defect in the Class Vehicles;

b.   Plaintiffs and the Class members could not reasonably have been expected to learn or discover that the Class Vehicles contained a dangerous Defect until the Defect manifested itself during Vehicle operation; and

c.   Defendants knew that Plaintiffs and the Class members could not reasonably have been expected to learn about or discover the Defect, especially given Toyota's refusal to acknowledge the Defect and attempts to explain it away.

113.   In failing to disclose the defective nature of the Class Vehicles, as well as the associated repair costs, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

114.   The facts not disclosed about the Defect would be material to the reasonable consumer, and are facts that a reasonable consumer would consider important in deciding whether to purchase or lease a Vehicle and how much to pay for it.  Owning or leasing a Vehicle with the Defect materially changes the manner in which the Vehicle can be used and enjoyed, resulting in Plaintiffs and Class members being unable to use the Vehicles in a manner consistent with their intended and regular purpose and usage.

115.   Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and/or the costs associated with remedying the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them.

116.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

117.   Plaintiffs are consumers under Civil Code § 1761(d).   Civil Code § 1780(a)(2) permits any court of competent jurisdiction to enjoin practices that violate Civil Code § 1770.

118.   Plaintiffs also are entitled to recover actual or statutory compensatory/monetary damages as authorized by Civil Code § 1780(a)(1) and Civil Code § 1781(a)(1), restitution as applicable and authorized under Civil Code § 1780(a)(3), and punitive damages as authorized by Civil Code § 1780(a)(4), which are appropriate in this case in light of Defendants' knowing, intentional, malicious, fraudulent and unconscionable conduct; Defendants' reckless disregard of its legal obligations to Plaintiff and the members of Class; and/or as otherwise recoverable under Civil Code § 1780(a)(4).

119.   Plaintiffs and the members of Class also are entitled to recover attorneys' fees and costs pursuant to Civil Code §§ 1780 and 1781.

120.   Under Civil Code § 1782(a), Plaintiffs provided the required 30-day notice before filing the Complaint pursuant to Civil Code § 1782(d).   Following receipt of the notice, Toyota refused to provide the requested remedies to the Class.

### THIRD CAUSE OF ACTION
### (Violation of California "Secret Warranty" Law, Civil Code §1795.92)

121.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

122.   The issuance by Toyota of the TSB on June 3, 2010 constitutes a program or policy that expands or extends, in a blanket fashion, consumers' standard warranty beyond its stated limit.   The TSB is also an offer by Toyota to pay for the cost of repairing, or to reimburse consumers for the cost of repairing, the Defect, which substantially affects the durability, reliability, and performance

of the Vehicles.  The TSB is therefore an "adjustment program" as defined by Civil Code Section 1795.90(d).

123.   Toyota failed to notify Plaintiffs and the Class of the conditions giving rise to, and the principle terms and conditions of, the TSB within 90 days of its adoption.

124.   Toyota failed to notify its dealers, in writing, of all terms and conditions of the TSB within 30 days of its adoption.

125.   Plaintiffs and the Class are therefore entitled to monetary, statutory, and equitable relief pursuant to Civil Code Section 1795.92.

**FOURTH CAUSE OF ACTION**
**(New York Sub-Class)**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW**
**(Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349)**

126.   Corson ("New York Plaintiff") and the New York Sub-Class incorporate the allegations set forth above as if fully set forth herein.

127.   This claim is asserted in the alternative in the event that California law is deemed to not apply.

128.   Defendants' business acts and practices alleged herein constitute deceptive acts or practices under the New York General Business Law, Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 ("NYGBL").

129.   The practices of Defendants, described throughout this Complaint, violate the NYGBL for, *inter alia*, one or more of the following reasons:

a.   Toyota engaged in deceptive, unfair and unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which did, or tended to, mislead New York Plaintiff and the New York Sub-Class about facts that could not reasonably be known by the consumers;

b.   Toyota failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

c.   Toyota caused New York Plaintiff and the New York Sub-Class to suffer a probability of confusion and a misunderstanding of legal rights,

obligations and/or remedies by and through its conduct;

       d.    Toyota failed to reveal material facts to New York Plaintiff and the New York Sub-Class with the intent that New York Plaintiff and the New York Sub-Class members rely upon the omission;

       e.    Toyota made material representations and statements of fact to New York Plaintiff and the New York Sub-Class that resulted in New York Plaintiff and the New York Sub-Class reasonably believing the represented or suggested state of affairs to be other than what they actually were;

       f.    Toyota intended that New York Plaintiff and the New York Sub-Class rely on its misrepresentations and omissions, so that New York Plaintiff and other New York Sub-Class members would purchase the Vehicles; and

       g.    Under all of the circumstances, Toyota's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

130.  Toyota's actions impact the public interest because New York Plaintiff and members of the New York Sub-Class were injured in exactly the same way as thousands of others purchasing and/or leasing the Vehicles as a result of and pursuant to Toyota's generalized course of deception.

131.  Had New York Plaintiff and other members of the New York Sub-Class known of the defective nature of the Vehicles, they would not have purchased the Vehicles or would have paid less for them.

132.  The foregoing acts, omissions and practices proximately caused New York Plaintiff and other members of the New York Sub-Class to suffer actual damages in the form of, *inter alia*, monies spent to replace/repair the defective EPS System and/or diminution in value of the Vehicles, and are entitled to recover such damages, together with appropriate damages including punitive damages, attorneys' fees and costs of suit.

### FIFTH CAUSE OF ACTION
#### (New York Sub-Class)
### BREACH OF EXPRESS WARRANTY
#### (N.Y. U.C.C. § 2-313)

133.   New York Plaintiff and the New York Sub-Class incorporate the allegations set forth above as if fully set forth herein.

134.   This claim is asserted in the alternative in the event that California law is deemed to not apply.

135.   As an express warrantor and manufacturer and merchant, Toyota had certain obligations under N.Y. U.C.C. § 2-313 to conform the Vehicles to the express warranties.

136.   When New York Plaintiff and the members of the New York Sub-Class purchased and/or leased their Vehicles (either as new Vehicles or as a used Vehicle with remaining warranty coverage), Toyota expressly warranted that it "will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."  Toyota went on to promise that it would pay for all repairs and parts to replace defective parts.

137.   The Defect at issue in this litigation was present at the time of sale and lease to New York Plaintiff and members of the New York Sub-Class.

138.   Toyota breached its express warranties (and continues to breach these express warranties) because it did not (and does not) cover the expenses associated with replacing the defective EPS System in New York Plaintiff's and the New York Sub-Class members' Vehicles.

139.   Pursuant to the express warranties, Toyota was obligated to pay for or reimburse New York Plaintiff and the New York Sub-Class members for costs incurred in replacing the defective EPS System.

140.   Pursuant to the express warranties, Toyota also was obligated to repair the Defect.

141.   Toyota and its agent dealers have failed and refused to conform the Vehicles to the express warranties and Toyota's conduct, as discussed throughout

this Complaint, has voided any attempt on its part to disclaim liability for its actions.

142.   New York Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Toyota or by operation of law in light of Toyota's unconscionable conduct described throughout this Complaint.

143.   Toyota received timely notice regarding the problems at issue in this litigation (indeed, Toyota knew of the Defect prior to offering the Vehicles for sale or lease) and, notwithstanding such notice, Toyota has failed and refused to offer an effective remedy.

144.   In addition, Toyota has received, on information and belief, numerous complaints and other notices from consumers advising it of the Defect at issue in this litigation.

145.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Toyota to limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present as of the time of sale or lease, which Toyota knew about prior to offering the Vehicles for sale or lease, which Toyota concealed and did not disclose, and which Toyota did not remedy prior to sale or lease (or afterward) is unconscionable and any such effort to disclaim or otherwise limit liability for the Defect at issue is null and void.

146.   Accordingly, New York Plaintiff and the New York Sub-Class members suffered damages caused by Toyota's breach of the express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

/ / /

/ / /

/ / /

/ / /

### SIXTH CAUSE OF ACTION
### (New York Sub-Class)
### BREACH OF IMPLIED WARRANTY
### (N.Y. U.C.C. § 2-314)

147.  New York Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

148.  This claim is asserted in the alternative in the event that California law is deemed to not apply.

149.  Toyota is and was at all relevant times a merchant with respect to the Vehicles.

150.  A warranty that the Vehicles were in merchantable quality and condition is implied by law pursuant to N.Y. U.C.C. § 2-314.

151.  Toyota impliedly warranted that the Vehicles were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

152.  The Vehicles were defective at the time they left the possession of Toyota.  These defects include the defective EPS system and related Defect described previously.  Toyota knew of the Defect at the time these transactions occurred.  Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not safe or fit for their ordinary intended purpose.

153.  By virtue of the conduct described herein and throughout this Complaint, Toyota breached the implied warranty of merchantability.

154.  New York Plaintiff and the New York Sub-Class members have been damaged as a direct and proximate result of Toyota's breach of the implied warranty.

155.  New York Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Toyota or by operation of law in light of Toyota's unconscionable conduct.

156.  Toyota received timely notice regarding the problems at issue in this

litigation (indeed, Toyota knew of the Defect prior to offering the Vehicles for sale or lease) and, notwithstanding such notice, Toyota has failed and refused to offer an effective remedy.

157.   In addition, Toyota has received, on information and belief, tens of thousands of complaints and other notices from consumers advising of the Defect associated with the Vehicles.

158.   New York Plaintiff has had sufficient dealings with either Toyota or its agents (dealerships) to establish privity of contract.   Notwithstanding this, privity is not required in this case because New York Plaintiff and the New York Sub-Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

159.   As a direct and proximate result of Toyota's breach of warranties, New York Plaintiff and the New York Sub-Class were caused to suffer economic damage, including loss attributable to the diminished value of their Vehicles, as well as the monies spent and to be spent to repair and/or replace their Vehicles.

**SEVENTH CAUSE OF ACTION**
**(Pennsylvania Sub-Class)**
**VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(73 P.S. §§ 201-1 *et seq.*)**

160.   Yack ("Pennsylvania Plaintiff") and the Pennsylvania Sub-Class incorporate the allegations set forth above as if fully set forth herein.

161.   This claim is asserted in the alternative in the event that California law is deemed to not apply.

162.   Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("PUTPCPL").

163.   At all relevant times, Pennsylvania Plaintiff and all members of the Pennsylvania Sub-Class were "consumers" within the meaning of the PUTPCPL, 73 P.S. § 201-1.

164.   Defendants' conduct, as set forth herein, occurred in the conduct of a sale within the meaning of the PUTPCPL, 73 P.S. § 201-1.

165.   The practices of Defendants, described above, violate the PUTPCPL for, *inter alia*, one or more of the following reasons:

a.   Toyota engaged in unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which did, or tended to, mislead Pennsylvania Plaintiff and the Pennsylvania Sub-Class about facts that could not reasonably be known by the consumer;

b.   Toyota failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

c.   Toyota caused Pennsylvania Plaintiff and the Pennsylvania Sub-Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

d.   Toyota failed to reveal material facts to Pennsylvania Plaintiff and the Pennsylvania Sub-Class with the intent that Pennsylvania Plaintiff and the Pennsylvania Sub-Class members rely upon the omission;

e.   Toyota made material representations and statements of fact to Pennsylvania Plaintiff and the Pennsylvania Sub-Class that resulted in Pennsylvania Plaintiff and the Pennsylvania Sub-Class reasonably believing the represented or suggested state of affairs to be other than what they actually were;

f.   Toyota intended that Pennsylvania Plaintiff and the Pennsylvania Sub-Class rely on its misrepresentations and omissions, so that Plaintiffs and other Pennsylvania Sub-Class members would purchase the

Vehicles;

g.   Toyota's conduct violated this act by its failure to conform to its written warranties; and

h.   Under all of the circumstances, Toyota's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

166.   Toyota's actions impact the public interest because Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class were injured in exactly the same way as thousands of others purchasing and/or leasing the Vehicles as a result of and pursuant to Toyota's generalized course of deception.

167.   Had Pennsylvania Plaintiff and other members of the Pennsylvania Sub-Class known of the defective nature of the Vehicles, they would not have purchased the Vehicles, or would have paid less for them.

168.   The foregoing acts, omissions and practices proximately caused Pennsylvania Plaintiff and other members of the Pennsylvania Sub-Class to suffer an ascertainable loss and actual damages in the form of, *inter alia*, monies spent to replace the defective EFS system and/or diminution in value of the Vehicles with a defective EFS system that need to be replaced.   Pennsylvania Plaintiff did not receive the benefit of her bargain, and is entitled to recover such damages, together with appropriate damages, attorneys' fees and costs of suit.

**EIGHTH CAUSE OF ACTION**
**(Pennsylvania Sub-Class)**
**BREACH OF EXPRESS WARRANTY**
**(PA. U.C.C. § 2313)**

169.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class incorporate the allegations set forth above as if fully set forth herein.

170.   This claim is asserted in the alternative in the event that California law is deemed to not apply.

171.   As an express warrantor and manufacturer and merchant, Toyota had certain obligations under PA. U.C.C. § 2313 to conform the Vehicles to the express warranties.

172.   When Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class purchased and/or leased their Vehicles (either as new Vehicles or as a used Vehicle with remaining warranty coverage), Toyota expressly warranted that it "will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."   Toyota went on to promise that it would pay for all repairs and parts to replace defective parts.

173.   The Defect at issue in this litigation was present at the time of sale and lease to Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class.

174.   Toyota breached its express warranties (and continues to breach these express warranties) because it did not (and does not) cover the expenses associated with replacing the defective EFS system in Pennsylvania Plaintiff's and the Pennsylvania Sub-Class members' Vehicles and because the EFS system needs to be replaced.

175.   Pursuant to the express warranties, Toyota was obligated to pay for or reimburse Pennsylvania Plaintiff and the Pennsylvania Sub-Class members for costs incurred in replacing the defective EFS system.

176.   Pursuant to the express warranties, Toyota also was obligated to repair the Defect.

177.   Toyota and its agent dealers have failed and refused to conform the Vehicles to the express warranties and Toyota's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

178.   Pennsylvania Plaintiff has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Toyota or by operation of law in light of Toyota's

unconscionable conduct described throughout this Complaint.

179.   Toyota received timely notice regarding the problems at issue in this litigation (indeed, Toyota knew of the defects prior to offering the Vehicles for sale or lease) and, notwithstanding such notice, Toyota has failed and refused to offer an effective remedy.

180.   In addition, Toyota has received, on information and belief, numerous complaints and other notices from consumers advising them of the Defect at issue in this litigation.

181.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Toyota to limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present as of the time of sale or lease, which Toyota knew about prior to offering the Vehicles for sale or lease, which Toyota concealed and did not disclose, and which Toyota did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the Defect at issue is null and void.

182.   Further, the warranties Defendants provided to Pennsylvania Plaintiff and Pennsylvania Sub-Class members with the sale or lease of the Vehicles, in that they will repair defective parts, were affirmations of fact, which became part of the basis of the bargain and, therefore, constitute express warranties.

183.   In reliance upon said express warranty, Pennsylvania Plaintiff and the Pennsylvania Sub-Class members purchased the Vehicles.

184.   Pennsylvania Plaintiff and members of the Pennsylvania Class are in privity with Toyota.   Toyota markets its products directly to consumers and maintains a direct relationship with purchasers.   Toyota-authorized dealers and service professionals are agents of Toyota and their participation in the sale, maintenance, and repair of Vehicles at the direction and under the supervision of Toyota, does not interrupt the direct relationship between Toyota and Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class.   Pennsylvania Plaintiff and

members of the Pennsylvania Sub-Class purchased their Vehicles directly from Toyota or Toyota's actual or apparent agents, including Toyota-authorized dealers.

185.   Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class also are in privity with Toyota by virtue of the contractual relationship stemming from the manufacturer's warranty Toyota provided in conjunction with the sale of its Vehicles, regardless of where, or from whom, the Vehicles were acquired.

186.   Accordingly, Pennsylvania Plaintiff and the Pennsylvania Sub-Class members suffered damages caused by Toyota's breach of the express warranties and are entitled to recover damages, including, but not limited to, diminution of value.

**NINTH CAUSE OF ACTION**
**(Pennsylvania Sub-Class)**
**BREACH OF IMPLIED WARRANTY**
**(P.A. U.C.C. § 2314)**

187.   Pennsylvania Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

188.   This claim is asserted in the alternative in the event that California law is deemed to not apply.

189.   Toyota is and was at all relevant times a merchant with respect to the Vehicles.

190.   A warranty that the Vehicles were in merchantable quality and condition is implied by law pursuant to P.A. U.C.C. § 2314.

191.   Toyota impliedly warranted that the Vehicles were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

192.   The Vehicles were defective at the time they left the possession of Toyota.  Toyota knew of the Defect at the time these transactions occurred.  Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

193.   By virtue of the conduct described herein and throughout this Complaint, Toyota breached the implied warranty of merchantability.

CLASS ACTION COMPLAINT

194.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class members have been damaged as a direct and proximate result of Toyota's breach of the implied warranty.

195.   Pennsylvania Plaintiff has performed each and every duty required of her under the terms of the warranties, except as may have been excused or prevented by the conduct of Toyota or by operation of law in light of Toyota's unconscionable conduct.

196.   Toyota received timely notice regarding the problems at issue in this litigation (indeed, Toyota knew of the Defect prior to offering the Vehicles for sale or lease) and, notwithstanding such notice, Toyota has failed and refused to offer an effective remedy.

197.   In addition, Toyota has received, on information and belief, numerous complaints and other notices from consumers advising of the Defect associated with the Vehicles.

198.   Pennsylvania Plaintiff has had sufficient dealings with either Toyota or its agents (dealerships) to establish privity of contract.  Notwithstanding this, privity is not required in this case because Pennsylvania Plaintiff and the Pennsylvania Sub-Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are intended beneficiaries of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles.  The warranty agreements were designed for and intended to benefit the ultimate consumers only.

199.   As a direct and proximate result of Toyota's breach of warranties, Pennsylvania Plaintiff and the Pennsylvania Sub-Class were caused to suffer economic damage, including loss attributable to the diminished value of their Vehicles, as well as the monies spent and to be spent to repair and/or replace their Vehicles.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the Class request that the Court enter an order or judgment against Defendants as follows:

A.   Certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.   Awarding Plaintiffs and other members of the Class damages and all other relief available under the claims alleged;

C.   Awarding Plaintiffs and other members of the Class pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

D.   Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and other costs of litigation;

E.   Requiring Defendants to disgorge the revenue earned through the sale of the Vehicles;

F.   Enjoining Defendants from engaging in the conduct described of herein;

G.   Awarding Plaintiffs and other members of the Class restitution; and

H.   Awarding such other and further relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: October 3, 2012          By:   _Thomas D. Mauriello_
                                      Thomas D. Mauriello

MAURIELLO LAW FIRM, APC
1181 Puerta Del Sol, Suite 120
San Clemente, CA 92673
Telephone: 949-542-3555
Facsimile: 949-606-9690
Email:  tomm@maurlaw.com

CLASS ACTION COMPLAINT

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John F. Edgar
EDGAR LAW FIRM LLC
1032 Pennsylvania Ave.
Kansas City, MO 64105
Telephone: 816-531-0033
Facsimile: 816-531-3322
Email: jfe@edgarlawfirm.com

James C. Shah (SBN 260435)
Natalie Finkelman Bennett
SHEPHERD,FINKELMAN,
MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: 610-891-9880
Facsimile: 610-891-9883
Email:        jshah@sfmslaw.com
              nfinkelman@sfmslaw.com

Chad Lucas
Bradley D. Kuhlman
KUHLMAN & LUCAS LLC
1100 Main Street Ste. 2550
Kansas City, MO 64105
Telephone: 816-799-0330
Facsimile: 816-799-0336
Email: chad@kuhlmanlucas.com
       brad@kuhlmanlucas.com

*Co-counsel for Plaintiffs*

# **<u>EXHIBIT A</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Irene Corson and Susan M. Yacks, On Behalf of Themselves and All Others Similarly Situated, ) ) ) ) | CIVIL ACTION NO. |
| Plaintiffs, ) ) | CLASS ACTION |
| v. ) ) | |
| Toyota Motor Sales, U.S.A., Inc. and ) Toyota Motor Corporation ) | |
| Defendants. ) ) | JURY TRIAL DEMANDED |

## DECLARATION OF IRENE CORSON

I, Irene Corson, declare under penalty of perjury as follows:

1.      I make this declaration based upon my personal knowledge except as to those matters stated herein that are based upon information or belief, which I believe to be true.

2.      I am an adult citizen of the State of New York.  I reside in Middle Grove, New York, and I am a named Plaintiff in this litigation.

3.      In or about July 2009, I purchased a new 2009 Toyota Corolla from an authorized Toyota dealer in Saratoga Springs, New York.

4.      To the best of my knowledge, information and belief, Defendant Toyota Motor Sales, U.S.A., Inc., is a California corporation with its principal place of business and executive offices located in Torrance, California.

5.      To the best of my knowledge, information and belief, Defendant Toyota Motor Corporation, through its involvement with Toyota Motor Sales, U.S.A., Inc., does business directly and/or indirectly in California.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 28 day of September, 2012 at Middle Grove, New York.

_Irene Corson_

IRENE CORSON

2

1

2 **IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

3

4 Irene Corson and Susan M.
Yacks, On Behalf of Themselves
5 and All Others Similarly Situated,        CIVIL ACTION NO.

6
                       Plaintiffs,
7        v.                                  CLASS ACTION

8 Toyota Motor Sales, U.S.A., Inc. and
Toyota Motor Corporation
9                      Defendants.            JURY TRIAL DEMANDED

10

11 

12                **DECLARATION OF SUSAN M. YACKS**

13

14     I, Susan M. Yacks, declare under penalty of perjury as follows:

15     1.     I make this declaration based upon my personal knowledge except as
to those matters stated herein that are based upon information or belief, which I
16 believe to be true.

17     2.     I am an adult citizen of the Commonwealth of Pennsylvania.  I reside
18 in Lancaster, Pennsylvania and I am a named Plaintiff in this litigation.

19     3.     In or about July 2009, I purchased a used 2009 Toyota Corolla from
20 an authorized Toyota dealer in East Petersburg, Pennsylvania.

21     4.     To the best of my knowledge, information and belief, Defendant
22 Toyota Motor Sales, U.S.A., Inc., is a California corporation with its principal
23 place of business and executive offices located in Torrance, California.

24     5.     To the best of my knowledge, information and belief, Defendant
25 Toyota Motor Corporation, through its involvement with Toyota Motor Sales,
26 U.S.A., Inc., does business directly and/or indirectly in California.

27

28

1    I declare under penalty of perjury under the laws of the Commonwealth of

2   Pennsylvania that the foregoing is true and correct. Executed this _28_ day of

3   September, 2012 at Lancaster, Pennsylvania.

4

5                                    SUSAN M. YACKS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV12- 8499 DSF (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:Thomas D. Mauriello (SBN144811)
MAURIELLO LAW FIRM, APC
1181 Puerta Del Sol, Suite 120
San Clemente, CA 92673
Tel: (949) 542-3555/Fax: (949) 606-9690
Email: tomm@maurlaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRENE CORSON and SUSAN M. YACKS, On Behalf Of Themselves And All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC. and TOYOTA MOTOR CORPORATION,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV12-8499 -DSF(VBKx)<br><br><br>SUMMONS |

TO:    DEFENDANT(S): *Toyota Motor Sales, U.S.A., Inc. and Toyota Motor Corporation*

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Thomas D. Mauriello_____, whose address is _1181 Puerta Del Sol, Suite 120, San Clemente, CA 92673, Tel: (949) 542-3555_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

OCT - 3 2012

Clerk, U.S. District Court

Dated: _____       By: _____
                                                    Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address: Thomas D. Mauriello (SBN 144811)
MAURIELLO LAW FIRM, APC
1181 Puerta Del Sol, Suite 120
San Clemente, CA 92673
Tel: (949) 542-3555/Fax: (949) 606-9690
Email: tomm@maurlaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRENE CORSON and SUSAN M. YACKS, On Behalf Of Themselves And All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC. and TOYOTA MOTOR CORPORATION,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV12-8499 _DSF (VBKx)<br><br><br>SUMMONS |

TO:   DEFENDANT(S): Toyota Motor Sales, U.S.A., Inc. and Toyota Motor Corporation

A lawsuit has been filed against you.

Within  21  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Thomas D. Mauriello _____, whose address is  1181 Puerta Del Sol, Suite 120, San Clemente, CA 92673, Tel: (949) 542-3555 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   OCT - 3 2012 

By: _____
MARILYN DAVIS
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                    SUMMONS

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

BY FAX

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| IRENE CORSON and SUSAN M. YACKS, On Behalf Of Themselves And All Others Similarly Situated | TOYOTA MOTOR SALES, U.S.A., INC. and TOYOTA MOTOR CORPORATION |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Thomas D. Mauriello (SBN 144811), MAURIELLO LAW FIRM, APC, 1181 Puerta Del Sol, Suite 120, San Clemente, CA 92673 Tel: (949) 542-3555/Fax: (949) 606-9690/Email: tomm@maurlaw.com | Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No   ☑ MONEY DEMANDED IN COMPLAINT: $ To Be Determined at Trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
23 U.S.C. sec. 1332(d) (diversity jurisdiction)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☑ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:   Case Number:   **CV12-8499**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                            ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                            ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                            ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Plaintiff Irene Corson - State of New York<br>Plaintiff Susan M. Yacks - State of Pennsylvania |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Defendant Toyota Motor Sales, U.S.A., Inc. - County of Los Angeles<br>Toyota Motor Corporation - County of Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| County of Los Angeles | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date October 3, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |